EDUMOZ, LLC, Plaintiff,

v.

**REPUBLIC OF MOZAMBIQUE;** Ministry of Education of the Republic of Mozambique; Celio Mondlane, an individual; Zeferino Martins, an individual; Joaquim Chissano Foundation a/k/a Fundacao Joaquim Chissano, a quasi–governmental organization; Joaquim Chissano, an individual; and Does 1–50, inclusive, Defendants.

**Case No. CV 13–02309 MMM (CWx).**

United States District Court,
C.D. California.

Sept. 10, 2013.

Seth M. Stodder, Zein E. Obagi, Jr., Obagi and Stodder LLP, Beverly Hills, CA, for Plaintiff.

Juan C. Basombrio, John S. Baker, Dorsey and Whitney LLP, Costa Mesa, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

MARGARET M. MORROW, District Judge.

On October 5, 2012, EduMoz, LLC filed this action against the Republic of Mozambique and the Ministry of Education of the Republic of Mozambique ("the government defendants"), Celio Mondlane, Joaquim Chissano Foundation, and Joaquim Chissano ("the Foundation defendants"), and Zeferino Martins.[1] On April 1, 2013, the government defendants removed the action to this court.

On May 2, 2013, the Foundation defendants and the government defendants collectively filed a motion to dismiss the complaint pursuant to Rules 12(b)(1), 12(b)(2), 12(b)(6), and 12(b)(7).[2] EduMoz opposes the motion.[3]

## I. FACTUAL BACKGROUND

### A. Facts Alleged in the Complaint

#### 1. The Parties

EduMoz, LLC ("EduMoz") is a Delaware limited liability company.[4] It is allegedly the successor-in-interest to Silberberg Innovations, LLC ("Silberberg

Innovations"), a California limited liability company.[5] Alan Silberberg is the principal and chief executive officer of Silberberg Innovations and EduMoz.[6]

The Republic of Mozambique ("Mozambique") is a foreign state. Chissano Foundation ("Foundation") is a Mozambican quasi-governmental organization purportedly dedicated to educating Mozambican children.[7] The Foundation allegedly contracted with Mozambique's Ministry of Education and stood to benefit by receiving education grants and direct contributions from it.[8] Celio Mondlane is a citizen of Mozambique and Project Director of the Foundation.[9] Zeferino Martins is a citizen of Mozambique, who served as the country's Minister of Education at all relevant times. Joaquim Chissano is a citizen of Mozambique, who is a principal of the Foundation and a former president of Mozambique.

EduMoz alleges that Mondlane and Martins were agents of Mozambique and the Ministry.[10] It asserts that in his dealings with EduMoz, Mondlane frequently represented that he was acting on Mozambique's behalf.[11] EduMoz also contends that Mondlane was an agent of the Foundation and Chissano,[12] and allegedly signed documents as project director of the Foundation.[13] Finally, EduMoz alleges that

1. Removal, Exh. 22 ("Complaint"), Docket No. 2–1 (Apr. 1, 2013).

2. Motion to Dismiss the Complaint, Docket No. 32 (May 2, 2013).

3. Opposition to Defendants' Motion to Dismiss or, in the Alternative, Request for Jurisdictional Discovery and Leave to Amend, Docket No. 42 (June 17, 2013).

4. Complaint, ¶ 2.

5. Id.

6. Id.

7. Id., ¶ 7.

8. Id.

9. Id., ¶ 5.

10. Id., ¶ 14.

11. Id.

12. Id.

13. Id.

Martins was an agent of both the Foundation and Chissano.

## 2. The Contract

Beginning on or about December 19, 2010, Silberberg and Mondlane communicated concerning the launch of an educational initiative in Mozambique.[14] Silberberg Innovations developed the brand "Educate Mozambique" to be used in promoting the initiative.[15] The initiative was intended to highlight (1) the progress of the Ministry of Education in educating children, and (2) "the adverse consequences of world organizations' unfunded promises." [16]

In March 2011, the parties began to negotiate a contract for services related to the initiative; Silberberg sent Mondlane a written proposal.[17] In April 2011, Silberberg sent Mondlane a proposed contract for Silberberg Innovation's services.[18] The following month, in May 2011, Mondlane told Silberberg Mozambique required that the agreement take the form of a "Contract of Mandate" pursuant to Mozambique's protocol for procurement.[19] He also said that Silberberg Innovation's proposed contract was too complicated for Martins and needed to be simplified.[20] Silberberg revised the proposed agreement so that it took the form of a "Contract of Mandate" and sent it to Mondlane.[21] He also sent Silberberg Innovations' banking information to Mondlane so that the wire transfers contemplated by the contract could be sent.[22]

On May 25, 2011, Mondlane advised Silberberg by telephone that Martins, the Mozambican Minister of Education, had signed the contract.[23] Mondlane also sent Silberberg information prepared by the Ministry of Education for development of the "Education Mozambique" initiative, including information concerning the Ministry's five-year strategic plan, information about the grants promised to Mozambique, and how the Ministry planned to use those grants.[24] The information was provided in Portugese, so Silberberg Innovations had to have the documents translated into English.[25] Once Mondlane told Silberberg that Martins had signed the contract, Silberberg Innovations began to create a blog, Twitter account, and other forms of media for the "Educate Mozambique" initiative.[26]

On May 26, 2011, Mondlane sent Silberberg an electronic copy of the contract executed by Martins. The parties to the agreement were Martins in his governmental capacity as Minister of Education of the Republic of Mozambique, as Mandator, and Silberberg Innovations, LLC, as Mandatory.[27] Martins signed and dated the contract "25.05.11." [28] Martins initialed, signed, and embossed each page with an

---

14. *Id.,* ¶¶ 15–20.

15. *Id.*

16. *Id.,* ¶ 21.

17. *Id.,* ¶ 22.

18. *Id.,* 23.

19. *Id.*

20. *Id.,* ¶ 24.

21. *Id.,* ¶ 25.

22. *Id.*

23. *Id.,* ¶ 26.

24. *Id.,* ¶ 27.

25. *Id.*

26. *Id.,* ¶ 28.

27. *Id.*

28. *Id.,* ¶ 30.

official government stamp.[29] Weeks later, Silberberg Innovations received two hard copies of the agreement signed by Martins. Silberberg executed the contract on behalf of his company and returned it to Mondlane.[30]

On June 15, 2011, Silberberg received an originally executed copy of the contract.[31]

Under the contract, Martins, the Ministry, and Mozambique promised to pay Silberberg Innovations for work on the "Educate Mozambique" initiative as follows:

- $175,000 upon commencement of the contemplated work;
- $175,000 upon completion of the contemplated work within six months;
- An additional 8% of the amount recovered by the "Educate Mozambique" campaign if it recovered under $10 million;
- An additional 7% if the campaign recovered between $10 and $30 million;
- An additional 6% if the campaign recovered between $30 and $5 million; and
- An additional 5 % if the campaign recovered more than $75 million.[32]

### 3. Silberberg Innovations' Performance and Defendants' Breach

Relying on the electronic copy of the contract signed by Martins, Silberberg Innovations began working on the "Educate Mozambique" campaign in May 2011.[33]

After Mondlane asked Silberberg to generate media attention for President Chissano's June 15, 2011 visit to Washington D.C.,[34] Silberberg Innovations secured television and talk radio interviews for Chissano, and publicized the "Educate Mozambique" campaign on the Internet.[35] Silberberg Innovations also induced CBS News to publish a written piece on "Educate Mozambique."

On June 13, 2011, Mondlane emailed Silberberg to advise that President Chissano could not travel to Washington D.C. due to a crisis he was negotiating in Ethiopia.[36] In the email, Mondlane allegedly stated: "The Minister of Education has already seen the CBS–News Post & was very excited about the media coverage." [37] Although Silberberg Innovations cancelled the press interviews it had scheduled for President Chissano, Silberberg discussed the mission of "Educate Mozambique" in an interview with Federal Talk Radio.[38]

Between May and December 2011, Silberberg Innovations promoted Mozambique, the Ministry, and the Foundation; due to its efforts, CBS News, Crowdsourcing.org, FederalNewsRadio.com, and AfricaAfrica.org purportedly published flattering pieces regarding these entities and the "Educate Mozambique" initiative.[39] On December 2011, the "Educate Mozambique" initiative allegedly obtained a $130 million grant.[40]

29. *Id.*

30. *Id.*

31. *Id.,* ¶ 34; Complaint, Exh. A ("Contract").

32. Complaint, ¶ 33.

33. *Id.,* ¶ 35.

34. *Id.,* ¶ 36.

35. *Id.*

36. *Id.,* ¶ 37.

37. *Id.,* ¶ 38.

38. *Id.,* ¶ 39.

39. *Id.,* ¶ 40.

40. *Id.;* see also, ¶ 43.

Between June 2011 and February 2012, Mondlane offered a variety of excuses as to why Silberberg Innovations had not received the initial $175,000 retainer due under the contract.[41] On April 1, 2012, Silberberg sent Mondlane a letter demanding $350,000 and at least $6.5 million in success fees. On May 1, 2012, Mondlane responded that he had been unable to locate the proper person in the Mozambican government to make the contractual payments owed to Silberberg Innovations.[42]

EduMoz alleges claims for fraud; constructive fraud; an accounting; breach of contract; negligence; unjust enrichment; and violation of California's Unfair Competition Law, California Business & Professions Code § 17200 *et seq.*[43]

### B. Request for Judicial Notice

EduMoz requests that the court take judicial notice of nine facts and one document related to its claims.[44] Defendants oppose the motion.[45]

In ruling on a motion to dismiss, the court can consider material that can be judicially noticed under Rule 201 of the Federal Rules of Evidence. FED. R.EVID. 201. Under Rule 201, the court can judicially notice "[o]fficial acts of the legislative, executive, and judicial departments of the United States," and "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to

sources of reasonably indisputable accuracy."

EduMoz requests that the court take judicial notice of the following facts:

1. That Manuel Chang was the Minister of Finance for the Republic of Mozambique in January 2010.

2. That Manuel Chang was the Minister of Finance for the Republic of Mozambique during May 2011.

3. That Manuel Chang was the Minister of Finance for the Republic of Mozambique as of October 17, 2012.

4. That Zeferino Martins was the Minister of Education for the Republic of Mozambique during May 2011.

5. That Manuel Chang has offered no testimony in this action.

6. That no "Minister in charge of Finances" for the Republic of Mozambique has offered any declaration in this action.

7. That Zeferino Martins has offered no testimony in this action.

8. That, on March 14, 2013, the Los Angeles Superior Court in *EduMoz, LLC v. Republic of Mozambique, et al.*, LASC Case No. BC493314, entered Zeferino Martins' default.[46]

9. That there has been no federal or state court order setting aside Martins' default.

---

41. *Id.,* ¶ 42.

42. *Id.,* ¶ 48.

43. Complaint at 1.

44. Plaintiff's Request for Judicial Notice, Docket No. 46 (June 17, 2013).

45. Opposition to Plaintiff's Request for Judicial Notice, Docket No. 53 (June 24, 2013).

46. Zeferino Martins did not join the government defendants' and Foundation defendants'

motion to dismiss. Those defendants do not oppose EduMoz's request that the court judicially notice Martins' default and the fact that it has not been set aside. None of the parties, however, refers to the default entered against Martins by the Los Angeles Superior Court in their briefs. Accordingly, the court need not address EduMoz's request for judicial notice of the default the lack of any set aside order at this time.

EduMoz also requests that the court take judicial notice of the contents of USAID report concerning corruption in Mozambique as of December 16, 2005.

In support of its request for judicial notice of the first four facts, EduMoz proffers excerpts from four Central Intelligence Agency ("CIA") *World Factbook* entries concerning Mozambique dated January 28, 2011; March 7, 2011; November 2, 2011; and October 17, 2012. Public facts concerning the governments of sovereign nations that "are capable of immediate and accurate determination" are appropriate subjects of judicial notice. See *Collins v. Loisel,* 259 U.S. 309, 314, 42 S.Ct. 469, 66 L.Ed. 956 (1922) (taking judicial notice of the fact that the consul general of the United States was the principal diplomatic officer in Calcutta); *Greeson v. Imperial Irr. Dist.,* 59 F.2d 529, 531 (9th Cir.1932) ("[T]he court is bound to take notice of public facts and geographical positions, and also of populations of cities and counties, public documents, reports of Commissions made to Congress, and proceedings thereon, etc."); see also *Roe v. Unocal Corp.,* 70 F.Supp.2d 1073, 1078 (C.D.Cal.1999) (taking judicial notice of the fact that the United States conducts diplomatic relations with SLORC/SPDC as the current government of Burma and as such, recognizing that SLORC/SPDC is a foreign sovereign for purposes of the act of state doctrine, citing Department of State's 1999 Burma Country Commercial Guide).

Other courts have taken judicial notice of facts set forth in the CIA's *World Fact-book.* See *Sadiki v. Gonzales,* 218 Fed. Appx. 27, 30 n. 1 (2d Cir.2007) (Unpub.Disp.) (relying on the CIA Factbook to take judicial notice of the fact that Serbia and Montenegro are independent nations, and that Kosovo is an autonomous province within Serbia); *Philipps v. Talty,* 555 F.Supp.2d 265, 267 n. 2 (D.N.H.2008) ("[T]he court sua sponte takes judicial notice that St. Martin/St. Maarten is an island in the Caribbean, southeast of Puerto Rico. The island is politically divided (roughly in half) between France (St. Martin) and the Netherlands Antilles ([St.] Maarten). The northern half of the island is part of the Overseas Department of Guadalupe, France, and it employs the French legal system," citing Central Intelligence Agency, THE WORLD FACTBOOK (2008), https://www.cia.gov/library/publications/the-world-factbook/geos/rn. html); *Sulieman v. Roswell Park Cancer Inst.,* No. 05–CV–0766A(F), 2007 WL 1851640, *5 (W.D.N.Y. June 27, 2007) (citing the CIA Factbook in taking judicial notice of the fact that 97% of the population of Iraq is Muslim); *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F.Supp.2d 289, 296 n. 4 (S.D.N.Y. 2003) (taking judicial notice of facts concerning Sudan's geography and population, and citing the CIA Factbook). Defendants do not object to EduMoz's first four judicial notice requests.[47] Consequently, the court takes judicial notice of the fact that Manuel Chang was the Minister of Finance for the Republic of Mozambique in January 2010, during May 2011, and as of October 17, 2012. It also takes judicial

---

**47.** Defendants do ask that the court "deny Plaintiff's requests to take judicial notice of the documents (CIA World Fact Books) described as Exhibits 1, 2, 3, and 4 in the Request for Judicial Notice." They argue, in part, that EduMoz does not specify which facts in the reports it seeks to have the court judicially notice. EduMoz submitted CIA *World Factbook* entries in support of its first four requests for judicial notice. Defendants do not dispute the accuracy of those facts as set forth in the *World Factbook* entries. The court need not notice the entries themselves in order to notice the facts, and declines to do so.

notice of the fact that Zeferino Martins was Minister of Education for the Republic of Mozambique during May 2011.

■ EduMoz's fifth through seventh requests for judicial notice concern whether or not certain items appear on the court docket for this action. The court can take judicial notice of its own docket. See *Jacobsen v. Mims*, No. 1:13–cv–00256–SKO–HC, 2013 WL 1284242, *2 (E.D.Cal. Mar. 28, 2013) ("The Court may take judicial notice of court records," citing FED.R.EVID. 201(b); *United States v. Bernal–Obeso*, 989 F.2d 331, 333 (9th Cir.1993)). The court takes judicial notice of the fact that defendants filed the declaration of Manuel Chang with their reply in support of the motion to dismiss on June 24, 2013, eight days after EduMoz filed its opposition to the motion.[48] The court also takes judicial notice of the fact that neither Zeferino Martins nor any individual purporting to be a "Minister in charge of Finances" has submitted a declaration or other form of testimony as of the date of this order.

Defendants object to EduMoz's request for judicial notice of the contents of the USAID report as "vague and overbroad" because EduMoz does not specify which "facts" in the report it seeks to have the court judicially notice. They also assert that the USAID report is irrelevant. Defendants do not, however, dispute the accuracy of facts concerning corruption in Mozambique contained in the USAID report.

■ Courts have held that "[j]udicial notice is appropriate for records and 'reports of administrative bodies.'" *United States v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943, 955 (9th Cir.2008) (quoting *Interstate Natural Gas Co. v. Southern California Gas Co.*, 209 F.2d 380, 385 (9th Cir.1954)). USAID is a federal government agency. Other courts have taken judicial notice of similar reports published by federal agencies. See, e.g. *American–Arab Anti–Discrimination Comm. v. Reno*, 70 F.3d 1045, 1070 (9th Cir.1995) (taking judicial notice of State Department publications for the purpose of assessing the strength of government's interest in prohibiting individuals from remaining in the United States); *United States v. Quintanilla*, No. CR 09–01188 SBA, 2011 WL 4502668, *9 n. 5 (N.D.Cal. Sept. 28, 2011) (taking judicial notice of the "[a]buse of children, child labor, forced child prostitution, and trafficking in … children" documented in the State Department's 2004 Country Report on Human Rights Practices in El Salvador). The court therefore takes judicial notice of the contents of the USAID report concerning corruption in Mozambique. The court will assess the relevancy of those portions of the report cited by EduMoz in addressing the merits of the motion to dismiss.

## C. The Parties' Motions to Strike Legal Expert Declarations [49]

### 1. Defendants' Motion to Strike the Declaration of Edwin M. Smith

In support of its opposition to the motion to dismiss, EduMoz proffers the ex-

---

**48.** Declaration of Manuel Chang, Docket No. 47–3 (June 24, 2013).

**49.** EduMoz has also filed objections to and motions to strike the declarations of Abel Zaque Mondlane (Plaintiff's Objections and Motion to Strike Declaration of Zaque Mondlane ("Zaque Mondlane MTS"), Docket No. 37 (June 17, 2013)), Celio Mondlane (Plaintiff's

Objections and Motion to Strike Declaration of Celio Mondlane ("Celio Mondlane MTS"), Docket No. 39 (June 17, 2013)), and Paulo Bernardo Manique (Plaintiff's Objections and Motion to Strike Declaration of Paulo Bernardo Manhique ("Manhique MTS"), Docket No. 40 (June 17, 2013)). Defendants oppose the motions. (See Opposition to Plaintiff's Objections and Motion to Strike the Declaration of

pert declaration of Edwin M. Smith, Jr., an international law professor at the Gould School of Law, University of Southern California.[50] Defendants have moved to strike Smith's declaration, arguing that it consists entirely of improper legal conclusions.[51] EduMoz opposes the motion.[52]

"Experts may interpret and analyze factual evidence but may not testify about the law." *S.E.C. v. Capital Consultants, LLC,* 397 F.3d 733, 749 (9th Cir. 2005) (citing *Crow Tribe of Indians v. Racicot,* 87 F.3d 1039, 1045 (9th Cir.1996)). The entirety of Smith's expert declaration consists of testimony about the Foreign Sovereign Immunities Act ("FSIA"). Smith draws legal conclusions regarding the application of that law to the facts of this case. Specifically, Smith describes activities in which the parties purportedly engaged, asserts that those activities were conducted in the United States, and concludes that they fall under the "commercial activity" exception to the FSIA, 28 U.S.C. §§ 1602, et seq.[53]

Interpreting the FSIA and applying it to the facts are functions that the court is competent to perform without the aid of an expert. The court will therefore disregard Smith's declaration in deciding this motion. See *United States v. Scholl,* 166 F.3d 964, 973 (9th Cir.1999) ("[I]t is well settled that the judge instructs the jury in the law. Experts interpret and analyze factual evidence. They do not testify about the law because the judge's special legal knowledge is presumed to be sufficient, and it is the judge's duty to inform the jury about the law that is relevant to their deliberations," citing *U.S. v. Brodie,* 858 F.2d 492, 496–97 (9th Cir.1988) (internal quotations omitted)).[54]

Abel Zaque Mondlane, Docket No. 458 (June 24, 2013); Opposition to Plaintiff's Objections and Motion to Strike the Declaration of Celio Mondlane, Docket No. 50 (June 24, 2013); Opposition to Plaintiff's Objections and Motion to Strike the Declaration of Paulo Bernardo Manhique, Docket No. 51 (June 24, 2013)). To the extent it relies on these witnesses' declarations, the court addresses EduMoz's objections to the declarations and defendants' responses to the objections *infra.*

**50.** Expert Declaration of Edwin M. Smith, Jr. in Support of Plaintiff's Opposition of Defendants' Motion to Dismiss ("Smith Decl."), Docket No. 45 (June 17, 2013) at 1–2.

**51.** Defendants' Objections and Motion to Strike the Expert Declaration of Edwin M. Smith, Jr. in Support of Defendants' Motion to Dismiss, Docket No. 52 (June 24, 2013) at 1–2.

**52.** Opposition to Defendants' Objections and Motion to Strike the Declaration of Edwin M. Smith, Jr. Docket No. 57 (July 1, 2013).

**53.** *Id.* at 3.

**54.** Edumoz argues that defendants' reliance on *Scholl* is misplaced because there will be no jury in this case, and *Scholl* discusses a judge's duty to instruct the jury concerning the law. *Scholl* is nonetheless relevant, however, insofar as it discusses the distinction between the judge's role and that of an expert. *Scholl's* holding that the court's legal knowledge is presumed sufficient without the aid of an expert is equally applicable to nonjury matters. Because the court is competent to interpret and apply the FSIA without expert assistance, Smith's declaration is not useful and the court disregards it. See *Cardenas v. Whittemore,* No. 10cv1808–LAB–KSC, 2013 WL 497864, *1 (S.D.Cal. Feb. 8, 2013) ("'[A]n expert witness cannot given an opinion as to the witness' legal conclusions; deciding the applicable law is the exclusive province of the Court.... Because the case will be tried to the Court without a jury, the introduction of inadmissible evidence is not so serious a problem as it would be in a jury trial.... Nevertheless, it is the practice of federal courts to exclude inadmissible evidence when the issue is raised.... [T]he Court agrees with Plaintiffs that the proffered testimony giving Van Atta's own legal conclusions would not be helpful to the Court, ... and is not admissible. The motion in limine is GRANTED and the testimony it describes is ORDERED EXCLUDED," citing *CIT Group/Business Credit,*

### 2. EduMoz's Motions to Strike the Declaration of Teresa Muenda [55]

EduMoz seeks to exclude portions of Teresa Muenda's declaration pursuant to Rule 703 of the Federal Rules of Evidence.[56] Rule 44.1 of the Federal Rules of Civil Procedure, however, provides that

"[a] party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, *whether or not submitted by a party or admissible under the Federal Rules of Evidence.* The court's determination must be treated as a ruling on a question of law."

FED.R.CIV.PROC. 44.1 (emphasis added). Rule 44.1 gives the court considerable discretion in deciding whether or not to consider a party's submission regarding relevant foreign law. See *Thomson Consumer Elecs., Inc. v. Innovatron, S.A.,* 3 F.Supp.2d 49, 52 (D.D.C.1998) ("When answering a question of foreign law, a federal court is authorized to look to a host of sources, including evidence in the form of expert testimony"); *Pfizer, Inc. v. Elan Pharm. Research Corp.,* 812 F.Supp. 1352, 1360 (D.Del.1993) (concluding that the court had discretion to disregard a foreign attorney's affidavit on foreign law under Rule 44.1); *Chantier Naval Voisin v. M/Y Daybreak,* 677 F.Supp. 1563, 1567

(S.D.Fla.1988) ("Under Fed. R.Civ.P. 44.1, it is clear that while the court may accept evidence submitted by the parties as to the proof of foreign law, it is not bound by the evidence submitted and may make its own investigation and consider 'any relevant material or source,' *id.,* concerning the foreign law"); see also *DP Aviation v. Smiths Industries Aerospace and Defense Systems Ltd.,* 268 F.3d 829, 848 (9th Cir. 2001) ("In some cases foreign law may be proved by reference to authorities; in others foreign law experts may testify").

■ While expert testimony may be useful, it is not "an invariable necessity in establishing foreign law, and indeed, federal judges may reject even the uncontradicted conclusions of an expert witness and reach their own decisions on the basis of independent examination of foreign legal authorities." *Access Telecom, Inc. v. MCI Telecomms. Corp.,* 197 F.3d 694, 713 (5th Cir.), cert. denied, 531 U.S. 917, 121 S.Ct. 275, 148 L.Ed.2d 200 (2000); see also *Batruk v. Mitsubishi Motors Corp.,* Nos. 94 Civ. 7593, 8677, 1998 WL 307383, *3 (S.D.N.Y. June 19, 1998) (Wood, J.); *In re Arbitration Between: Trans Chem. Ltd. and China Nat'l Mach. Import and Export Corp.,* 978 F.Supp. 266, 275 (S.D.Tex. 1997), aff'd, 161 F.3d 314 (5th Cir.1998); *Curtis v. Beatrice Foods Co.,* 481 F.Supp. 1275, 1285 (S.D.N.Y.) (Pollack, J.), aff'd, 633 F.2d 203 (2d Cir.1980).

---

*Inc. v. Graco Fishing & Rental Tools., Inc.,* 815 F.Supp.2d 673, 678 (S.D.N.Y.2011) (granting a motion in limine to exclude an expert's legal opinions during a bench trial)).

**55.** Declaration of Teresa Filomena Muenda ("Muenda Decl."), Docket No. 32–4 (May 2, 2013).

**56.** Objections and Motion to Strike Declaration of Teresa Filomena Muenda ("Muenda MTS"), Docket No. 38 (June 17, 2013). Rule 703 provides: "An expert may base an opin-

ion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." FED. R.EVID. 703.

#### a. EduMoz's First Objection

EduMoz objects to the statement in paragraph seven of Muenda's declaration. There, she states: "In the case *subjudice*, the evidence suggests that there was no provision for the expenditures arising out of the referenced 'contract' in the budget for the corresponding year. Nevertheless, even if there were, the contract requiring their incurrence would require the prior authorization by the Ministry of Finance." [57] EduMoz asserts that Muenda's opinion is not based on reliable facts or data, and that its probative value is outweighed by the danger of unfair prejudice.[58] It contends that although, under Rule 703, an expert opinion must be based on an adequate foundation, Muenda "does not cite 'the evidence' that she has reviewed." [59]

EduMoz's reliance on Rule 703 is misguided. Defendants appear to offer Muenda as an expert in foreign law, since the majority of her declaration concerns Mozambican law. As noted, under Rule 44.1, courts, "in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." FED.R.CIV. PROC. 44.1. "One common source that judges rely upon in determining foreign law are the affidavits of lawyers who practice law in the country at issue, or who are from the country at issue and are familiar with its laws." *Transportes Aereos Pegaso, S.A. de C.V. v. Bell Helicopter Textron, Inc.,* 623 F. Supp.2d 518, 534 (D.Del.2009); *Akande v. Transamerica Airlines, Inc.,* No. 1039–VCP, 2007 WL 1555734, *7 (Del. Ch. May 25, 2007).

Muenda's personal knowledge of Mozambican law is established by her declaration, which states that her opinions are based on eleven years as a practicing attorney in Mozambique. Muenda's testimony that a government contract requires prior authorization by the Minister of Finance, whether or not the contract was included in the budget for the corresponding year, is a statement of Mozambican law. The court can consider this evidence regarding Mozambican law under Rule 44.1.

By contrast, Muenda's statement that the evidence suggests there was no provision for expenditures associated with the contract in Mozambique's budget for 2011 does not assist the court in determining the content of applicable foreign law. The court will therefore disregard this statement as an improper subject of expert testimony on foreign law. See *Krish v. Balasubramaniam,* No. 1:06–CV–01030 OWW, 2006 WL 2884794, *3 (E.D.Cal. Oct. 10, 2006) ("[E]vidence from foreign law experts submitted pursuant to Rule 44.1 is admissible only to aid a court's understanding of foreign law; foreign law experts may not opine as to the ultimate application of the foreign law to the facts of the case").

#### b. EduMoz's Second Objection

EduMoz also objects to the statement in paragraph eight of Muenda's declaration that "contracts for the supply of goods and services to the State, according to the law of procurement (Decree 15/2010), are subject to prior approval of the Administrative Court, a formality which, not having been observed, renders the contract equally null and void." [60]

57. Muenda Decl., ¶ 7.

58. Muenda MTS at 2.

59. *Id.* at 3.

60. Muenda Decl., ¶ 8.

Because it appears that Muenda references Mozambican contract law, the court can consider her testimony. See *Nieves–Villanueva v. Soto–Rivera*, 133 F.3d 92, 99–100 (1st Cir.1997) ("The one well-recognized exception is for questions of foreign law, where the judge may be aided by the expert's assistance.... Even in the case of foreign law, under modern practice the testimony is generally given to the judge, outside of the presence of the jury, and is meant to assist the judge in determining the appropriate instructions").

### c. EduMoz's Third Objection

EduMoz next objects to the statement in paragraph twelve of Muenda's declaration that "we understand that the courts of Mozambique are competent." [61] It is not entirely clear what Muenda meant to communicate by the word "competent." Read in the context of the balance of the paragraph and the following paragraph, however,[62] it appears that the challenged statement is meant to communicate that Mozambican courts can exercise personal jurisdiction over the defendants.[63] So interpreted, the court can consider the statement.

The challenged statement is only relevant, however, to defendants' argument that this case should be dismissed under the doctrine of *forum non conveniens*. For reasons stated below, the court lacks jurisdiction to consider EduMoz's claims and does not reach the parties' arguments concerning *forum non conveniens* as a result. Consequently, the court need not consider this portion of Muenda's declaration.

### d. EduMoz's Fourth Objection

EduMoz objects to the statement in paragraph 15 of Muenda's declaration that "[o]n the other hand, Mozambique puts foreigners on the same footing as nationals as to the enjoyment of civil rights and assures to anyone access to the courts, guaranteeing the right to a defense, legal assistance, legal support, and free choice of defense counsel to assist throughout the legal proceedings." [64]

As noted, under Rule 44.1, courts, "in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed.R.Civ.Proc. 44.1. "One

---

**61.** *Id.* at 5–6.

**62.** See Muenda Decl., ¶ 12 (stating that the courts of Mozambique "are competent[ ]as the domicile of the Defendants"); *id.*, ¶ 13 ("Defendants may, objectively, be defendants before the courts of Mozambique").

**63.** See *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust ex rel. Fed. Nat. Mortgage Ass'n v. Raines*, 534 F.3d 779, 785 (D.C.Cir. 2008) ("The words 'of competent jurisdiction' [in the statute] help clarify that: (i) litigants in state courts of limited jurisdiction must satisfy the appropriate jurisdictional requirements, see *Osborn* [*v. Bank of U.S.*], 22 U.S. (9 Wheat.) [738] at 817–18 [6 L.Ed. 204 (1824)] (finding federal jurisdiction because of statute empowering a federal corporation 'to sue and be sued ... *in all state courts having competent jurisdiction,* and in any circuit court of the United States') (internal quotation marks

omitted) (emphasis added); (ii) litigants, whether in federal or state court, must establish that court's personal jurisdiction over the parties, see *Blackmar v. Guerre*, 342 U.S. 512, 516, 72 S.Ct. 410, 96 L.Ed. 534 (1952) (noting that a 'court of "competent jurisdiction" ' for the purpose of hearing suits against civil service commissioners must be one that possessed personal jurisdiction over those commissioners); see also *United States v. Morton*, 467 U.S. 822, 828, 104 S.Ct. 2769, 81 L.Ed.2d 680 (1984); (iii) litigants relying on the 'sue-and-be-sued' provision can sue in federal district courts but not necessarily in all federal courts, see *Red Cross*, 505 U.S. at 256 n. 8, 112 S.Ct. 2465; *id.* at 267, 112 S.Ct. 2465 (Scalia, J., dissenting) ...").

**64.** Muenda Decl., ¶ 15.

common source that judges rely upon in determining foreign law are the affidavits of lawyers who practice law in the country at issue, or who are from the country at issue and are familiar with its laws." *Transportes Aereos Pegaso, S.A. de C.V.,* 623 F.Supp.2d at 534; *Akande,* 2007 WL 1555734 at *7. Given of Muenda's expertise in Mozambican law, her familiarity with the case at hand, her citation of portions of the Mozambican constitution, the wide latitude Rule 44.1 affords courts, and the fact that courts have long relied on affidavits submitted by attorneys practicing in foreign jurisdictions when determining foreign law, the court concludes that it may properly rely on Muenda's statement regarding access to and the operation of the Mozambican courts.

The challenged statement is only relevant, however, to defendants' argument that this case should be dismissed under the doctrine of *forum non conveniens.* Because, as noted, the court concludes that it lacks jurisdiction to consider EduMoz's claims, it need not reach the issue of *forum non conveniens,* and thus need not consider this portion of Muenda's declaration.

### e. EduMoz's Fifth Objection

EduMoz also objects to the statement in paragraph 16 of Muenda's declaration that "[t]his, therefore, assures the independence, exemption and impartiality of the judiciary in Mozambique."[65] The preceding paragraph of the declaration, which was the subject of EduMoz's fourth objection, states: "Mozambique law puts foreigners on the same footing as nationals as to the enjoyment of civil rights and assures to anyone access to the courts, guaranteeing the right to a defense, legal assistance, legal support, and free choice of defense counsel to assist throughout the

legal proceedings."[66] It is not apparent how the independent and impartiality of the judiciary is necessarily ensured by laws that provide foreigners with equal protection of the laws and access to the courts. Paragraph 16 appears to speak more to the state of political affairs in Mozambique than the content of its laws; it is not, therefore, a proper subject of expert testimony under Rule 44.1. For this reason, and because the statement is relevant only to defendants' argument that the case should be dismissed under the doctrine of *forum non conveniens*—a question it does not reach—the court will disregard paragraph 16 of Muenda's declaration in deciding defendants' motion.

## II. DISCUSSION

### A. Legal Standard Governing Jurisdiction

■ The court has an independent obligation to examine its own jurisdiction. *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 230–31, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *United States v. United Mine Workers of America,* 330 U.S. 258, 292 n. 57, 67 S.Ct. 677, 91 L.Ed. 884 (1947) ("a court has jurisdiction to determine its own jurisdiction"); *Wells Fargo & Co. v. Wells Fargo Exp. Co.,* 556 F.2d 406, 430 n. 24 (9th Cir.1977) ("[A] trial court does have jurisdiction to determine its own jurisdiction"). Accordingly, the court will consider the jurisdictional issues raised by defendants' motion to dismiss before addressing the merits of EduMoz's claims.

### B. Whether the Court Can Exercise Personal Jurisdiction over Defendants

### 1. Legal Standard Governing Rule 12(b)(2) Motions To Dismiss

■ When a defendant moves to dismiss for lack of personal jurisdiction, the plain-

---

**65.** *Id.,* ¶ 16.

**66.** *Id.,* ¶ 15.

tiff bears the burden of demonstrating that the court may properly exercise jurisdiction over the defendant. *Pebble Beach Co. v. Caddy,* 453 F.3d 1151, 1154 (9th Cir. 2006); *Bohara v. Backus Hosp. Med. Benefit Plan,* 390 F.Supp.2d 957, 961 (C.D.Cal. 2005) (citing *Ziegler v. Indian River Cnty.,* 64 F.3d 470, 473 (9th Cir.1995)). Absent formal discovery or an evidentiary hearing, a plaintiff need make only a prima facie showing that jurisdiction is proper to survive a Rule 12(b)(2) motion to dismiss. *Pebble Beach,* 453 F.3d at 1154; *Rio Properties, Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1019 (9th Cir.2002); *Ziegler,* 64 F.3d at 473.

To satisfy this burden, a plaintiff can rely on the allegations in its complaint to the extent not controverted by the moving party. See, e.g., *Doe v. Unocal Corp.,* 248 F.3d 915, 922 (9th Cir.2001) ("Where not directly controverted, plaintiff's version of the facts is taken as true for the purposes of a 12(b)(2) motion to dismiss"). If the defendant adduces evidence controverting the allegations, however, plaintiff must "'come forward with facts, by affidavit or otherwise, supporting personal jurisdiction.'" *Scott v. Breeland,* 792 F.2d 925, 927 (9th Cir.1986) (quoting *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.,* 551 F.2d 784, 787 (9th Cir.1977)). "Conflicts between [the] parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 800 (9th Cir. 2004); see also *AT & T v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 588 (9th Cir.1996) ("In determining whether [the plaintiff] has met this burden, uncontroverted allegations in [the] complaint must be taken as true, and 'conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiff's] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists,'"

quoting *WNS Inc. v. Farrow,* 884 F.2d 200, 203 (5th Cir.1989)).

## 2. Whether the Court Can Exercise Personal Jurisdiction Over the Government Defendants

■ "Personal jurisdiction over a foreign state depends on subject matter jurisdiction over the action against the foreign state under the FSIA." *A.R. Int'l Anti–Fraud Sys., Inc. v. Pretoria Nat'l Cent. Bureau of Interpol,* 634 F.Supp.2d 1108, 1116–17 (E.D.Cal.2009); see also *Corzo v. Banco Central de Reserva del Peru,* 243 F.3d 519, 522 (9th Cir.2001) ("The [FSIA] conflates the usually distinct questions of sovereign immunity, subject matter jurisdiction, and personal jurisdiction"). Under the FSIA, personal jurisdiction over a foreign state exists only when the court has subject matter jurisdiction to hear the action and proper service has been made. *Altmann v. Republic of Austria,* 317 F.3d 954, 969 (9th Cir.2002) (citing 28 U.S.C. § 1330(b)); see also *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) ("[P]ersonal jurisdiction, like subject-matter jurisdiction, exists only when one of the exceptions to foreign sovereign immunity in [the FSIA] applies"). For reasons discussed *infra,* the court lacks subject matter jurisdiction to hear Edu-Moz's claims against the government defendants. Consequently, it lacks personal jurisdiction over them as well. *A.R. Int'l,* 634 F.Supp.2d at 1117 ("For the reasons described above, Interpol Pretoria is immune from suit in this court, and A.R. International fails to establish a statutory exception to FSIA. Accordingly, personal jurisdiction is lacking.... Because this Court finds subject matter and personal jurisdiction lacking, the Court need not consider whether personal jurisdiction is proper under the due process clause of the

Fifth Amendment or the applicable minimum contacts test").

### 3. Whether the Court Can Exercise Personal Jurisdiction Over Chissano

Defendants argue that EduMoz's claims against Chissano should also be dismissed for lack of personal jurisdiction. "The general rule is that personal jurisdiction over a defendant is proper if it is permitted by a long-arm statute and if the exercise of that jurisdiction does not violate federal due process." *Pebble Beach,* 453 F.3d at 1154–55 (citing *Fireman's Fund Ins. Co. v. Nat'l Bank of Cooperatives,* 103 F.3d 888, 893 (9th Cir.1996)); see also *Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.,* 243 F.Supp.2d 1073, 1082 (C.D.Cal.2003) (citing *Aanestad v. Beech Aircraft Corp.,* 521 F.2d 1298, 1300 (9th Cir.1974)). Because California authorizes jurisdiction to the full extent permitted by the Constitution, see CAL.CODE CIV. PROC. § 410.10, the only question the court must ask is whether the exercise of jurisdiction over Chissano would be consistent with due process. *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.,* 328 F.3d 1122, 1129 (9th Cir.2003); *Peterson v. Highland Music, Inc.,* 140 F.3d 1313, 1317 n. 2 (9th Cir.1998).

To satisfy due process, a defendant must have such "minimum contacts" with the forum state that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). There are two recognized bases for exercising personal jurisdiction over a nonresident defendant: (1) "general jurisdiction," which arises where defendant's activities in the forum are sufficiently "substantial" or "continuous and systematic" to justify the exercise of jurisdiction over him in all mat-

ters; and (2) "specific jurisdiction," which arises when a defendant's specific contacts with the forum give rise to the claim in question. *Helicopteros Nacionales de Colombia S.A. v. Hall,* 466 U.S. 408, 414–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Doe v. Am. Nat'l Red Cross,* 112 F.3d 1048, 1050–51 (9th Cir.1997).

#### a. General Jurisdiction

■ A court can exercise general jurisdiction over a defendant if the defendant's contacts with the forum are "substantial" or "continuous and systematic." *International Shoe Co.,* 326 U.S. at 316, 66 S.Ct. 154; see also *Data Disc, Inc. v. Systems Technology Assocs., Inc.,* 557 F.2d 1280, 1287 (9th Cir.1977); *Schwarzenegger,* 374 F.3d at 801 (plaintiff must show that defendant engaged in " 'continuous and systematic general business contacts' that 'approximate physical presence' in the forum state," quoting *Helicopteros,* 466 U.S. at 416, 104 S.Ct. 1868; *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.,* 223 F.3d 1082, 1086 (9th Cir.2000)). When properly invoked, general jurisdiction allows a federal court to hear *any* cause of action, even one unrelated to defendant's activities in the state. See *Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437, 445, 72 S.Ct. 413, 96 L.Ed. 485 (1952).

■ To determine if a defendant's activities within the forum are "continuous and systematic" or "substantial," the court must examine all of his activities impacting the state. See *Helicopteros,* 466 U.S. at 411, 104 S.Ct. 1868; *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 295, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Perkins,* 342 U.S. at 445–49, 72 S.Ct. 413. "Factors to be taken into consideration are whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there." *Bancroft*

& *Masters,* 223 F.3d at 1086 (citing *Hirsch v. Blue Cross, Blue Shield,* 800 F.2d 1474, 1478 (9th Cir.1986)).

 Defendants contend the complaint pleads no facts establishing that Chissano has contacts with this forum. EduMoz does not argue that Chissano has had "continuous and systematic" or "substantial" contacts with California sufficient to establish that the court can exercise general jurisdiction over him; it focuses instead on Chissano's alleged contacts with California through Celio Mondlane.[67] The court's review of the complaint reveals no factual allegations indicating that Chissano has had "continuous and systematic" or "substantial" contacts with this forum.[68] Accordingly, it concludes that it cannot exercise general jurisdiction over Chissano.

### b. Specific Jurisdiction

 Before the court can exercise specific jurisdiction over a defendant, the plaintiff must show three things: (1) that the defendant did some act or consummated some transaction in California by which he purposefully availed himself of the privilege of conducting activities in the state or that he undertook an act that was purposely directed at the state; (2) that plaintiff's claims arise out of such activities; and (3) that the exercise of jurisdiction is reasonable. See *Unocal Corp.,* 248 F.3d at 923; *Fireman's Fund Ins. Co.,* 103 F.3d at 894.

 "Purposeful availment analysis examines whether the defendant's contacts with the forum are attributable to his own actions or are solely the actions of the

plaintiff." *Sinatra v. Nat'l Enquirer,* 854 F.2d 1191, 1195 (9th Cir.1988). To demonstrate purposeful availment, a plaintiff must show that the defendant "engage[d] in some form of affirmative conduct allowing or promoting the transaction of business within the forum state." *Gray & Co. v. Firstenberg Machinery Co.,* 913 F.2d 758, 760 (9th Cir.1990) (citing *Shute v. Carnival Cruise Lines,* 897 F.2d 377, 381 (9th Cir.1990), overruled on other grounds, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991)); see also *Burger King v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) ("This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, ... or of the 'unilateral activity of another party or a third person' ..."). A defendant's contacts must be such that he should "reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp.,* 444 U.S. at 297, 100 S.Ct. 559.

Courts distinguish between contract and tort cases in assessing whether the first prong of the specific jurisdiction test is met. See *Roth v. Garcia–Marquez,* 942 F.2d 617, 621 (9th Cir.1991); see *Scholl v. F.D.I.C.,* No. 08–3977 SC, 2009 WL 1625947, *6 (N.D.Cal. June 5, 2009) ("A purposeful availment analysis is most often used in suits sounding in contract. A purposeful direction analysis is most often used in suits sounding in tort"). Here, EduMoz asserts claims against Chissano for fraud and negligence; these claims sound in tort.[69]

---

67. See Opp. at 19–20.

68. Compare Complaint, ¶ 5(a) (alleging that Celio Mondlane maintains a residence and bank account in the United States) with *id.,* ¶ 8 (alleging only that Chissano is a citizen of Mozambique and its former president).

69. Chissano is not named in EduMoz's breach of contract claim. (See Complaint at 19.) 23

In tort cases, courts can exercise specific jurisdiction over defendants who have committed an act that has an effect in the forum state, even if the act itself takes place outside state boundaries. See *Paccar Int'l, Inc. v. Commercial Bank of Kuwait, S.A.K.,* 757 F.2d 1058, 1064 (9th Cir.1985) ("The commission of an intentional tort in a state is a purposeful act that will satisfy the first two requirements under *Data Disc, Inc. v. Systems Technology Associates, Inc.,* 557 F.2d 1280, 1288 (9th Cir.1977). Indeed, a tortious act, standing alone, can satisfy all three requirements under *Data Disc* if the act is aimed at a resident of the state or has effects in the state"). Under the "effects test," a court can exercise personal jurisdiction over a defendant if the defendant "(1) committed an intentional act, which was (2) expressly aimed at the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state." *Excel Plas, Inc. v. Sigmax Co., Ltd.,* No. 07–CV–578–IEG (JMA), 2007 WL 2853932, *6 (S.D.Cal. Sept. 27, 2007) (citing *Bancroft & Masters,* 223 F.3d at 1087). It is not necessary that the defendant have had direct contact with the forum state. *Id.* (citing *Metropolitan Life Ins. Co. v. Neaves,* 912 F.2d 1062, 1065 (9th Cir. 1990)).

To apply this test, therefore, the court must assess whether Chissano committed intentional actions, expressly aimed at California, causing harm he knew was likely to be suffered in California. *Haisten v. Grass Valley Medical Reimbursement Fund,* 784 F.2d 1392, 1397 (9th Cir.1986) ("[W]ithin the rubric of 'purposeful availment' the Court has allowed the exercise of jurisdiction over a defendant whose only 'contact' with the forum state is the 'pur-

poseful direction' of a foreign act having effect in the forum state," citing *Calder v. Jones,* 465 U.S. 783, 789, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)).

Defendants contend the complaint alleges no facts indicating that Chissano committed intentional actions expressly aimed at California. The conduct of an agent, acting with apparent authority from his principal, will suffice to establish personal jurisdiction over the principal, however. *Myers v. Bennett Law Offices,* 238 F.3d 1068, 1073 (9th Cir.2001); see also *Besser v. Chapple,* No. SACV 09–230 DOC, 2010 WL 370336, *4–5 (C.D.Cal. Jan. 25, 2010). "A party claiming apparent authority of an agent must prove (1) that the acting party subjectively believed that the agent had authority to act for the principal[,] and (2) that the subjective belief in the agent's authority was objectively reasonable." *Myers,* 238 F.3d at 1073 n. 2; *Besser,* 2010 WL 370336 at *5.

EduMoz alleges that Celio Mondlane was the agent of both the Chissano Foundation and Chissano.[70] It asserts that Mondlane solicited Silberberg Innovations to work for Chissano; that Mondlane made constant reference to Chissano; and that Silberberg Innovations performed work in anticipation of Chissano's visit to the United States.[71] In his declaration, Silberberg states that Mondlane sought him out to perform services; that Mondlane constantly referred to Chissano and the Chissano Foundation; that he signed correspondence as the Project Director of the Joaquim Chissano Foundation; that he told Silberberg he was employed by the Foundation; that Silberberg believes Mondlane would not have sought to contract with his company but for Chissano; and that Mondlane and Silberberg commu-

---

**70.** *Id.,* ¶ 14(b).

**71.** Opp. at 19–20.

nicated about securing media coverage for Chissano's visit to the United States; and that Silberberg secured such media coverage.[72] Defendants do not dispute these factual allegations. In fact, Mondlane's declaration confirms that he communicated with Silberberg regarding the scheduling of an interview for Chissano during his planned visit to Washington D.C. in 2011.[73] Defendants similarly do not dispute Edu-Moz's allegations that Chissano is the Foundation's principal,[74] and that Mondlane is the Foundation's and Chissano's agent. To the contrary, Mondlane's declaration establishes that he worked with Chissano and that he had personal knowledge of Chissano's activities in his role as Project Director for the Foundation that bears Chissano's name.[75] The court finds these facts sufficient to demonstrate (1) that Silberberg believed Mondlane was Chissano's agent, and (2) that his belief was objectively reasonable.

The facts also show that the things Mondlane did with apparent authority to act for Chissano were intentional and aimed at this forum. EduMoz alleges that Mondlane solicited Silberberg Innovations to perform work for Chissano and the Foundation; that he promised it would be paid for that work; that Silberberg performed work in California (Silberberg Innovation's principal place of business) in reliance on Mondlane's representations; and that Silberberg Innovations was never paid for the work.[76] Silberberg confirms these facts in his declaration.[77] EduMoz's factual assertions are sufficient to demonstrate that Mondlane's intentional actions caused harm, "the brunt of which [was] suffered and which [he knew] [was] likely to be suffered in the forum state." *Bancroft & Masters*, 223 F.3d at 1087. Defendants, moreover, have adduced no evidence controverting the allegations.[78] As stated, Mondlane's declaration confirms that he communicated with Silberberg regarding the "Educate Mozambique" campaign, and regarding an interview for Chissano during his visit to Washington D.C. in 2011.[79] The court concludes, therefore, that at this stage of the litigation, EduMoz has established that the court can exercise specific jurisdiction over Chissano based on Mondlane's actions as his apparent agent. The court denies defendants' motion to dismiss EduMoz's claims against Chissano as a result.[80]

---

**72.** Silberberg Decl., ¶¶ 4–7; *id.*, ¶¶ 13–15. See also *id.*, Exh. 8.

**73.** Celio Mondlane Decl., ¶ 4. EduMoz objects that Mondlane's declaration lacks foundation. Mondlane has sufficient personal knowledge of his own communications and activities to testify about them, however. See *Ebay Inc. v. Kelora Sys., LLC*, Nos. C 10–4947 CW, C 11–1398 CW, C 11–1548 CW, 2012 WL 1835722, *11 n. 3 (N.D.Cal. May 21, 2012) ("Mr. Arnett attests that the statements in the declaration are based on his personal knowledge; many of the statements within the challenged paragraphs describe his own activities, including comments that he made and messages that he received. Thus, to extent that the Court relies upon the Arnett declaration, Kelora's objection is OVERRULED").

**74.** Complaint, ¶ 8.

**75.** See generally Celio Mondlane Decl.

**76.** See Opp. at 21.

**77.** See Silberberg Decl., ¶ 4; *id.*, ¶¶ 12–15; *id.*, ¶¶ 18–19; *id.*, Exh. 3.

**78.** Mondlane denies that he represented to Silberberg that Martins had actual authority to execute a contract under Mozambican law. (Celio Mondlane Decl., ¶ 6.) He does not deny he represented on behalf of the "Educate Mozambique" campaign or Chissano that Silberberg Innovations would be paid for the work, however.

**79.** Celio Mondlane Decl., ¶¶ 4–5.

**80.** As the party asserting jurisdiction, Edumoz has a continuing burden of showing that the court can properly exercise jurisdiction over

## C. Whether the Court Has Subject Matter Jurisdiction to Hear Claims Against the Government Defendants

### 1. Legal Standard Governing Rule 12(b)(1) Motions to Dismiss

A Rule 12(b)(1) motion tests whether the court has subject matter jurisdiction to hear the claims alleged in the complaint. Such a motion may be "facial" or "factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir.2004). Stated differently, a party mounting a Rule 12(b)(1) challenge to the court's jurisdiction may do so either on the face of the pleadings or by presenting extrinsic evidence for the court's consideration. See *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir.2000); *Thornhill Publ'g Co. v. Gen. Tel. & Elecs.*, 594 F.2d 730, 733 (9th Cir.1979). Whatever the nature of the challenge, the party seeking to sue in federal court bears the burden of burden of establishing that the court has subject matter jurisdiction to hear the action. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *Association of American Medical Colleges v. United States*, 217 F.3d 770, 778–79 (9th Cir.2000); *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir.1989).

Defendants have proffered declarations and documents in support of their Rule 12(b)(1) motion; they thus mount a factual attack on subject matter jurisdiction. The Ninth Circuit has held that the district court should apply a standard similar to that used in deciding summary judgment motions when asked to decide a factual attack under Rule 12(b)(1). Evidence outside the pleadings may be considered, but all factual disputes must be resolved in favor of the non-moving party. See *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir.1996) ("[W]e will consider items outside the pleading that were considered by the district court in ruling on the 12(b)(1) motion, but resolve all disputes of fact in favor of the non-movant.... [T]he standard we apply upon *de novo* review of the record is similar to the summary judgment standard that the district court purported to apply"); *In re Facebook Privacy Litigation*, 791 F.Supp.2d 705, 710 (N.D.Cal. 2011) ("[I]n the absence of a full-fledged evidentiary hearing, disputes in the facts pertinent to subject-matter are viewed in the light most favorable to the opposing party. The disputed facts related to subject-matter jurisdiction should be treated in the same way as one would adjudicate a motion for summary judgment" (internal citation omitted)); *Ambros–Marcial v. United States*, 377 F.Supp.2d 767, 771 (D.Ariz.2005) ("Where a motion 'properly should be labeled a dismissal for lack of jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1),' the Court may 'consider items outside the pleading ... but [shall] resolve all disputes of fact in favor of the non-movant ... similar to the summary judgment standard ...,' " quoting *Dreier*, 106 F.3d at 847). "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n. 2 (9th Cir.2003).

Chissano. *ITSI T.V. Prods., Inc. v. Agric. Ass'ns*, 3 F.3d 1289, 1291 (9th Cir.1993) (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936) (the party "seeking relief ... must carry throughout the litigation the burden of showing that he is properly in court")).

## 2. Whether the Court Has Subject Matter Jurisdiction to Hear Claims Against the Government Defendants under the Foreign Sovereign Immunities Act

■ Defendants argue that EduMoz's claims against the government defendants must be dismissed because the court lacks subject matter jurisdiction to hear the claims under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.* The "sole basis" upon which federal courts can obtain jurisdiction over a foreign state is the FSIA. *Amerada Hess Shipping Corp.,* 488 U.S. at 434, 109 S.Ct. 683. The FSIA establishes a "comprehensive framework for determining whether a court in this country, state or federal, may exercise jurisdiction over a foreign state." *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 610, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992).

"Under § 1604 of the FSIA, a foreign state is immune from the jurisdiction of the courts of the United States and of the States except as provided in various exceptions." *Terenkian v. Republic of Iraq,* 694 F.3d 1122, 1127 (9th Cir.2012). The FSIA's definition of a "foreign state" includes a "political subdivision of a foreign state or an agency or instrumentality of a foreign state." *Embassy of the Arab Republic of Egypt v. Lasheen,* 603 F.3d 1166, 1170 n. 2 (9th Cir.2010) (citing 28 U.S.C. § 1603(a)). An "agency or instrumentality of a foreign state" includes "an organ of a foreign state or political subdivision thereof." *Id.* (citing 28 U.S.C. § 1603(b)).

Defendants argue that the Republic of Mozambique has sovereign immunity because it is a foreign state. They contend that the Ministry of Education also has sovereign immunity because it is an organ of the Mozambican government and is therefore a foreign state as well. EduMoz does not dispute that each of the government defendants constitutes a "foreign state" under the FSIA.

Because defendants have adequately established that the government defendants are "foreign states," the burden shifts to EduMoz to overcome the presumption of sovereign immunity by adducing evidence that the conduct that forms the basis of the complaint falls within the scope of an applicable FSIA exception. See *Peterson v. Islamic Republic of Iran,* 627 F.3d 1117, 1125 (9th Cir.2010) ("Once the court has determined that the defendant is a foreign state, 'the burden of production shifts to the plaintiff to offer evidence that an exception applies,'" citing *Phaneuf v. Republic of Indonesia,* 106 F.3d 302, 305 (9th Cir.1997), cert. denied, 535 U.S. 987, 122 S.Ct. 1540, 152 L.Ed.2d 466 (2002)). EduMoz contends that the evidence it has adduced demonstrates that the FSIA's "commercial activity" exception applies. Under this exception,

> "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
> . . .
>
> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]" 28 U.S.C. § 1605(a)(2).

■ To determine whether certain conduct falls within the commercial activities exception, "the FSIA directs courts to look to the nature of the activity in question, rather than to its purpose." *Park v.*

*Shin,* 313 F.3d 1138, 1145 (9th Cir.2002). "Even if performed with a public purpose in mind, acts by governmental entities are considered commercial in nature if the role of the sovereign is one that could be played by a private actor.... [A]n activity is commercial unless it is one that only a sovereign state could perform." *Id.* (citing *Weltover, Inc.,* 504 U.S. at 614–15, 112 S.Ct. 2160; *Sun v. Taiwan,* 201 F.3d 1105, 1107–08 (9th Cir.), cert. denied, 531 U.S. 979, 121 S.Ct. 427, 148 L.Ed.2d 435 (2000); *MOL, Inc. v. Peoples Republic of Bangladesh,* 736 F.2d 1326, 1329 (9th Cir.1984)). As a consequence, courts have held that the commercial activities exception encompasses, among other things, a contract to purchase military supplies, *Joseph v. Office of Consulate General of Nigeria,* 830 F.2d 1018, 1027 (9th Cir.1987); the Argentine government's issuance of bonds in order to refinance government debt, *Weltover, Inc.,* 504 U.S. at 615, 112 S.Ct. 2160; and the act of hiring a domestic servant, *Park,* 313 F.3d at 1145.

 EduMoz argues that it has satisfied its burden of showing that the commercial activity exception applies because the subject contract "incontestably constitutes 'commercial activity' carried on by Mozambique's Ministry of Education."[81] Defendants do not dispute that the contract is commercial in nature. The court finds, therefore, that EduMoz has made a *prima facie* showing that a FSIA exception to immunity applies. See *CYBERsitter, LLC v. People's Republic of China,* 805 F.Supp.2d 958, 976 (C.D.Cal.2011) (the Chinese government's "purchase of the licensing and distribution rights to the Green Dam program and subsequent sublicensing of the program to manufactures were commercial acts," because "[c]learly, entities other than a sovereign state can purchase licenses for software programs

and, in turn, sublicense such programs to other actors"); *Farhang v. Indian Institute of Technology,* No. C–08–02658 RMW, 2010 WL 519815, *7–8 (N.D.Cal. Jan. 26, 2010) (a joint venture agreement to develop and market technology with a research institute funded and run by the Indian government fell within the commercial activities exception).

 Once a party "offers evidence that a[ ] FSIA exception to immunity applies, the party claiming immunity bears the burden of proving by a preponderance of the evidence that the exception does not apply." *Joseph,* 830 F.2d at 1021; see also *Phaneuf,* 106 F.3d at 307 ("Because Phaneuf offered evidence that the commercial activity exception applies, the defendants bear the burden of proving by a preponderance of the evidence that the exception does not apply"). Defendants argue that the exception does not apply because the government defendants did not engage in the commercial activity at issue. Citing *Phaneuf,* they contend that the government defendants cannot be said to have engaged in "commercial activity" because Martins lacked the "actual authority" to execute the contract with Silberberg on their behalf.

In *Phaneuf,* the plaintiff held several promissory notes executed by several then-members of Indonesia's National Defense Security Council ("NDSC"). 106 F.3d at 304. The notes bore the signatures of two NDSC members and the NDSC crest. *Id.* H.A. Chalid Mawardi, Indonesia's ambassador to Syria, purportedly confirmed that the NDSC notes were official governmental notes. The Republic of Indonesia later declared them worthless, however. Indonesia asserted that the creation of the notes was unauthorized and

---

81. Opp. at 7.

invalid under Indonesian law. It asserted that neither the NDSC nor any of its officials had authority to execute promissory notes. The NDSC issued a press release that disavowed responsibility for the notes, stating that responsibility lay with the individuals who signed the notes. Phaneuf sued the Republic of Indonesia, the NDSC, and Mawardi to enforce the notes in his possession.

Defendants argued that they were entitled to immunity under the FSIA. Specifically, they contended that the commercial activity exception did not apply because they were not responsible for execution of the notes. Indonesia and the NDSC asserted that they were not bound by the actions of former NDSC members or Mawardi because those officials had exceeded the scope of their authority in issuing and certifying the validity of the notes. The Ninth Circuit agreed that the commercial activity exception did not apply, holding that a government agent must have actual authority to carry out "commercial activity of a foreign state" within the meaning of the FSIA. *Id.* at 308. It reasoned: "When an agency acts beyond the scope of his authority, that agent 'is not doing business

which the sovereign has empowered him to do.... If the foreign state has not empowered its agent to act, the agent's unauthorized act cannot be attributed to the foreign state; there is no 'activity of the foreign state.'" *Id.*[82]

The Fourth Circuit considered very similar facts in *Velasco*, 370 F.3d 392. It concurred with the Ninth Circuit's view and held that the commercial activity exception can be invoked only when the officials of the foreign state have actual authority. *Id.* at 400. It stated:

"Whether a third party reasonably perceives that the sovereign has empowered its agent to engage in a transaction ... is irrelevant if the sovereign's constitution or laws proscribe or do not authorize the agent's conduct and the third party fails to make a proper inquiry. We conclude that a foreign official's manifestation of authority to bind the sovereign is insufficient to bind the sovereign." *Id.* at 400.

Defendants are not expressly named as parties to the contract,[83] which is an agreement between Martins and Silberberg In-

---

**82.** EduMoz urges the court to adopt the Second Circuit's "apparent authority" test for determining whether the commercial activity exception applies. See *First Fidelity Bank N.A. v. Government of Antigua & Barbuda*, 877 F.2d 189, 193 (2d Cir.1989) ("The question here would be whether Jacobs, as Antigua's ambassador to the United Nations, in the circumstances of this case possessed the apparent authority to borrow the money and to waive Antigua's sovereign immunity"). The Ninth Circuit expressly rejected such an approach in *Phaneuf*. See 106 F.3d at 308 ("Our conclusion that the commercial activity exception may be invoked against a foreign state only when its agents have acted with actual authority contradicts a Second Circuit case, *First Fidelity Bank, N.A. v. Government of Antigua & Barbuda—Permanent Mission*, 877 F.2d 189 (2d Cir.1989)"). The court is bound by Ninth Circuit precedent, and cannot

adopt and apply contradictory Second Circuit authority. See, e.g., *Singer v. Wells Fargo Bank, N.A.*, No. SACV 12–801 JVS (JPRx), 2012 WL 2847790, *3 (C.D.Cal. July 11, 2012). The court notes, moreover, that both the Fourth and Fifth Circuits have found the Ninth Circuit's approach in *Phaneuf* persuasive. See *Dale v. Colagiovanni*, 443 F.3d 425, 429 (5th Cir.2006) ("We agree with the Fourth and Ninth Circuits that an agent's acts conducted with the apparent authority of the state is insufficient to trigger the commercial exception to FSIA"); *Velasco v. Government of Indonesia*, 370 F.3d 392, 400 (4th Cir. 2004). Accordingly, the court declines to adopt the Second Circuit rule as urged by EduMoz.

**83.** Motion at 11.

novations.[84] The contract expressly obligates Martins—not Mozambique—to pay fees to Silberberg Innovations.[85] EduMoz argues, nonetheless, that Martins bound his principals, Mozambique and the Ministry, by signing the contract as Minister of Education.[86] It asserts that the contract discloses the parties' intent to bestow a benefit on and bind the government defendants.[87]

Defendants counter that Martins lacked actual authority to enter into the contract on their behalf for three reasons: (1) he failed to obtain the prior approval of the Mozambique Minister of Finance; (2) he failed to submit the contract to the Mozambique public bidding process; and (3) he failed to obtain the approval of the Mozambique Administrative Tribunal (the "Tribunal"). They contend that Mozambican procurement law required that each of these steps occur before the subject contract could be validly executed. As a result, they argue, the commercial activity exception does not apply.

EduMoz disagrees, asserting that Martins had actual authority to contract on behalf of the Ministry (and therefore, Mozambique). It contends that executing the contract fell within the scope of the Education Minister's duties as defined by Mozambican law. EduMoz does not dispute that Martins failed to comply with the procedures identified by defendants. It asserts, however, that the procedural infirmities defendants identify do not negate Martins' statutory authority as Education Minister. In support of this argument, they cite *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 697, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).[88] *Larson* specifically held, however, that the tortious actions of the agent of a sovereign may be attributed to the sovereign where they *"do not conflict with the terms of his valid statutory authority* [.]" *Id. Larson* does not state that the actions of an official are consistent with the terms of his "valid statutory authority" when they are undertaken in violation of procedures required by law, so long as they fall within the general scope of his official duties. Because defendants have adduced evidence that Martins' actions conflicted with laws circumscribing his authority independently to enter into contracts, *Larson* does not support Edumoz's contention that Martins

84. Complaint, Exh. 1.

85. *Id.*

86. Opp. at 7 n. 13.

87. *Id.*

88. Edumoz argued at the hearing on this motion that the commercial activity exception does not apply because Martins' failure to follow the procedures required by Mozambican law was not "visible" to Silberberg at the time the parties executed the contract. In support of this argument, Edumoz noted that Martins signed the contract as Education Minister and embossed the contract with the official seal of Mozambique. As stated, however, Ninth Circuit law requires that a government official have actual authority for the commercial activity exception to apply; the degree to which a foreign official's conduct appears to be authorized by law is not a dispositive factor. Nothing in *Phaneuf* suggests that its holding is limited to situations in which a foreign official's lack of actual authority is apparent or "visible." The fact that Martins used his official title and the Mozambican seal does not distinguish this case factually from *Phaneuf*. In that case, the notes at issue bore the official NDSC crest and were signed by two NDSC members. Moreover, Indonesia's ambassador purportedly confirmed that they were official notes. The Ninth Circuit concluded that these indicia of authority were not sufficient to characterize the issuance of the notes as the commercial activity of a foreign state; rather, it held, the issuers of the notes must have had actual authority for the commercial activity exception to apply. See *Phaneuf*, 106 F.3d at 304; see also *id.* at 308.

had actual authority to execute the subject contract.

The court cannot accept EduMoz's argument that the procedural infirmities cited by defendants do not negate Martins' statutory authority. Such an assertion is inconsistent with *Velasco* and the decisions of other courts that have considered the scope of the commercial activity exception in light of that decision and *Phaneuf.* In *Velasco,* the court held that the defendant ambassador's actions in confirming and legalizing the promissory notes at issue "were ultra vires and not binding on the Government of Indonesia" because he did not first obtain a power of attorney from the Ministry of Finance or "Full Powers" from the Department of Foreign Affairs. *Velasco,* 370 F.3d at 402.[89] As a consequence, the court held, "the issuance of the notes [could] not be characterized as the commercial activity of a foreign state which divest[ed] the [government defendants] of their sovereign immunity." *Id.* at 402. It therefore dismissed the claims against the government defendants. *Id.;* see also *Allfreight Worldwide Cargo, Inc. v. Ethiopian Airlines Ent.,* 307 Fed.Appx. 721, 725 (4th Cir.2009) (Unpub.Disp.)

("The evidence in the record establishes that Eddo and Shiferaw made a factual mistake as to their authority—that they were authorized to enter into a contract without first submitting it to [Ethiopian Airlines'] General Counsel. Their mistake, even if reasonable, cannot abrogate the sovereign's immunity by creating actual authority where none exists"). Cf. *Doe v. Qi,* 349 F.Supp.2d 1258, 1282 (N.D.Cal. 2004) ("[W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do," quoting *Chuidian v. Philippine Nat'l Bank,* 912 F.2d 1095 (9th Cir.1990), abrogated on other grounds by *Samantar v. Yousuf,* 560 U.S. 305, 130 S.Ct. 2278, 176 L.Ed.2d 1047 (2010) (internal quotation marks omitted)).[90]

EduMoz next asserts that defendants have failed to adduce sufficient evidence showing that Martins did not comply with Mozambique's procurement procedures before signing the contract.[91] Defendants have adduced evidence, however, that Mozambican law provides:

---

**89.** The *Phaneuf* court expressed no opinion as to whether the issuers of the NDSC notes or Ambassador Mawardi acted with actual authority. 106 F.3d at 308. It remanded to the district court to make this determination, holding only that an agent must act with actual authority in order for the plaintiff to invoke the commercial activity exception against a foreign state. *Id.*

**90.** Edumoz argues that *Phaneuf* and *Velasco* are factually distinguishable, and therefore inapposite, because they involved foreign officials who engaged in fraud for personal gain. Edumoz asserts that no fraud for personal gain is at issue here, because the only party that was to receive money as the result of Silberberg's efforts was the Republic of Mozambique. Edumoz cites no case that limits the holdings in *Phaneuf* and *Velasco* to circumstances involving fraud for personal gain,

however. Nor do the *Phaneuf* and *Velasco* opinions suggest that their holdings are limited to the specific facts before the court or to circumstances involving fraud for personal gain. Furthermore, EduMoz's allegations suggest that an entity other than the Republic of Mozambique was to benefit from the transaction in that it pleads that the Chissano Foundation was to receive education grants and contributions in connection with the "Educate Mozambique" initiative. (Complaint, ¶ 7.) Edumoz also alleges that Martins acted as an agent of the Foundation. At a minimum, these allegations suggest the possibility of fraud for gain by the Foundation and/or its purported agents.

**91.** As noted, Edumoz adduced no contrary evidence demonstrating that Martins did comply with Mozambican procurement laws.

"(1) Signing international contracts and agreements that implicate the State in assuming financial responsibilities or that involve public revenue requires prior authorization by the Minister in charge of Finances. . . .

(2) The lack of authorization by the Minister in charge of Finances will result in the contract or agreement being null and void, and thus no funds may be paid under that void contract." [92]

Specifically, they proffer a copy of Article 16 of Law No. 9/2002—the "State Financial Administration System" law—that sets forth these requirements. They also proffer Muenda's declaration. Muenda confirms that Article 16 of Law No. 9/2002 requires the contract be authorized by the Minister of Finance before Martins could sign it; that under Mozambican procurement law, the Tribunal must approve con-

tracts for the supply of goods and services to the State; and that Mozambique's Decree No. 15/2010 requires that contracts for the goods and services for the State be submitted to a public tender process.[93] Defendants also proffer the declaration of Abel Zaqueu Mondlane, the current Chief of Staff at the Ministry of Education; he states that the Ministry has no records indicating that Martins obtained the prior approval of the Minister of Finance or the Tribunal. Nor are there records indicating that the contract was ever subjected to the public bidding process.[94] Defendants also submit the declaration of Paulo Bernardo Manhique, Permanent Secretary of the Mozambican Ministry of Finance; he states that he has located no records referencing the contract, and notes that state budgets for 2011 and 2012 make no provision for any expenditure related to implementation of the contract.[95]

---

**92.** Basombrio Decl., Exh. 7.

**93.** Muenda Decl., ¶¶ 6–10.

**94.** Zaqueu Mondlane Decl., ¶ 8. EduMoz objects to this testimony on lack of foundation grounds. Although it concedes that Zaqueu Mondlane has established that he reviewed "the records" of the Ministry of Education, it asserts that he fails to establish adequate personal knowledge because he does not state that he reviewed "all" of the records. This argument is unpersuasive. It is clear that the challenged statement is meant to communicate that Zaqueu Mondlane searched all of the records of the Ministry of Education and did not find any of the approval/public bidding records in question. (See Second Declaration of Abel Zaqueu Mondlane ("Second Zaqueu Mondlane Decl."), Docket No. 47–2 (June 24, 2013), ¶ 4). Insofar as Zaqueu Mondlane personally reviewed the Ministry's records, he has personal knowledge of the results of that review. His personal knowledge may also be inferred from his position as Chief of Staff of the Ministry of Education. See *Mora v. Harley–Davidson Credit Corp.*, No. 1:08–cv–01453 OWW GSA, 2009 WL 464465, *4 n. 1 (E.D.Cal. Feb. 24, 2009) ("Seaman is competent to speak to the account records

based on his experience, position within the company, access to account records, and personal knowledge based on the review he initiated of HDCC account data"). The challenged statement is also not hearsay. Zaqueu Mondlane states that all approvals by the Ministry of Finance, submittals to the public bidding process, and approvals by the Tribunal are communicated in writing to create a record. (Second Zaqueu Mondale Decl., ¶ 5.) This testimony indicates that records of such actions are "regularly kept for a matter of that kind." FED.R.EVID. 803(7). Although EduMoz asserts that the court should not trust the completeness and accuracy of Mozambique's official records, it cites no evidence of "circumstances indicat[ing] a lack of trustworthiness." (*Id.*) EduMoz's objection to paragraph 8 of Zaqueu Mondlane's declaration is therefore overruled.

**95.** Manhique Decl., ¶ 4. EduMoz objects to this testimony on lack of foundation grounds. It contends that Manhique has not adequately shown that he personally reviewed the 2011 and 2012 state budgets. Paragraph four of Manhique's declaration states: "I have reviewed the records of the Ministry of Finance and have located no copy of the Alleged Con-

EduMoz contends that this evidence fails to establish Martins' lack of actual authority because there is no requirement in Mozambican law that the Finance Minister and Tribunal give their approval *in writing* before a contract can be executed. It asserts it is possible that Martins obtained oral approval from both the Finance Minister and the Tribunal, such that records of the approvals would not exist. EduMoz notes that defendants have adduced no evidence that Martins did not obtain oral approvals, and that they have not identified any provision of Mozambican law requiring that the approvals be memorialized in writing. EduMoz also argues that the court must draw an adverse inference from the fact that defendants have not submitted the declarations of the Finance Minister and Martins confirming that Martins failed to adhere to applicable procedures before executing the contract.[96]

In support of their reply, defendants adduce evidence that a written record of the required approvals would exist had Martins obtained such approvals. Citing his prior experience obtaining approvals of public contracts, Zaqueu Mondlane states that "approval from the Minister of Finance, the submittal to the public bidding process, and the approval by the Administrative Tribunal are all done in writing . . . to create a record." [97] Defendants also proffer the declaration of the Minister of Finance, Manuel Chang, who asserts:

"In my capacity as Minister of Finance of the Republic of Mozambique, I am the person who would have provided the required prior approval for the purported Contract, under Mozambican law. I never approved the Contract. I was never even made aware of the existence of the purported Contract. Also, I never authorized anyone at the Ministry of Finance to approve the Contract. . . . Such approvals are done in writing . . . to maintain a record. There is no writing approving the Contract." [98]

Chang also states that the Ministry of Finance would have been informed if the contract had been submitted to competitive public bidding or had been approved by the Tribunal. He contends that such approvals would have been in writing, and there is no record of such approvals.[99]

Based on the evidence in the record, the court concludes that defendants have met their burden of showing that the commercial activity exception is inapplicable because Martins acted outside the scope of his authority and failed to comply with Mozambican law in executing the contract. The government defendants are therefore entitled to sovereign immunity under the FSIA.

### 3. Whether This Action Should Be Dismissed for Reasons of Comity

Defendants next argue that the action should be dismissed in its entirety under

---

tract and no records that refer to the Alleged Contract. The State Budgets of 2011 or 2012 make no provision whatsoever for any expenditure relating to implementation of the Alleged Contract." (*Id.*) In context, it is clear that Manhique's testimony is based on his personal review of the state budgets of 2011 and 2012, which are presumably located within the records of the Ministry of Finance. Manhique's personal knowledge of the state budgets can also be inferred from his position as Permanent Secretary of the Ministry of Finance.

96. EduMoz does not argue that submitting the contract to the public bidding process could have been achieved orally, without a written record.

97. Second Zaqueu Mondlane Decl., ¶¶ 4–5.

98. Chang Decl., ¶ 4.

99. *Id.*, 5.

the Supreme Court's decision in *Philippines v. Pimentel,* 553 U.S. 851, 128 S.Ct. 2180, 171 L.Ed.2d 131 (2008), and the doctrines of international comity and abstention. In *Pimentel,* victims of human rights abuses who had obtained a judgment against then-President of the Philippines Ferdinand Marcos sought to attach property held by a bank. See *Bennett v. Islamic Republic of Iran,* 927 F.Supp.2d 833, 844–45 (N.D.Cal.2013) (summarizing *Pimentel*). The Supreme Court held that under Rule 19 of the Federal Rules of Civil Procedure, the action could not proceed without the Republic of the Philippines and the good-government commission created by the Republic as parties.[100] Because considerations of comity barred the court from adjudicating claims against the Republic and the commission, however, the Court held that the case should be dismissed. *Id.* at 873, 128 S.Ct. 2180.

The Supreme Court explained that "where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign." *Pimentel,* 553 U.S. at 864–67, 128 S.Ct. 2180. In concluding that comity interests required dismissal of the action, the Court reasoned:

"Comity and dignity interests take concrete form in this case. The claims of the Republic and the Commission arise from events of historical and political significance for the Republic and its people. The Republic and the Commission have a unique interest in resolving the ownership of or claims to the Arelma assets and in determining if, and how, the assets should be used to compensate those persons who suffered grievous injury under Marcos. There is a comity interest in allowing a foreign state to use its own courts for a dispute if it has a right to do so. The dignity of a foreign state is not enhanced if other nations bypass its courts without right or good cause. Then, too, there is the more specific affront that could result to the Republic and the Commission if property they claim is seized by the decree of a foreign court." *Id.* at 866, 128 S.Ct. 2180 (citing *Republic of Mexico v. Hoffman,* 324 U.S. 30, 35–36, 65 S.Ct. 530, 89 L.Ed. 729 (1945) (pre-FSIA, common-law doctrine dictated that courts defer to the executive's determination of immunity because "[t]he judicial seizure" of the property of a friendly state may be regarded as "an affront to its dignity and may ... affect our relations with it")).

■■■ The facts of this case are distinguishable from *Pimentel.* Based on the evidence submitted by the parties, the court has found that Martins' conduct was not authorized by Mozambique. EduMoz's claims against him do not, therefore, implicate Mozambique's sovereign interests; this is in contrast to the injuries wrecked by Marcos, which represented the actions of the sovereign. There is no suggestion, moreover, that the transaction between the parties in this case concerns "events of historical and political significance" for Mozambique and its people. Although the court recognizes the comity interest in allowing a foreign state to use its own courts to resolve a dispute, it cannot conclude that this factor alone is sufficiently weighty that it requires dismissal of this action in its entirety. This is particularly

---

**100.** As discussed further herein, Rule 19 provides: "If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed.R.Civ.Proc. 19(b).

true because the court has concluded that it must dismiss EduMoz's claims against Mozambique and the Ministry. Cf. *Jota v. Texaco, Inc.*, 157 F.3d 153, 160 (2d Cir. 1998) ("Though extreme cases might be imagined where a foreign sovereign's interests were so legitimately affronted by the conduct of litigation in a United States forum that dismissal is warranted without regard to the defendant's amenability to suit in an adequate foreign forum, this case presents no such circumstances").

Nor would a monetary recovery by Edu-Moz case result in the seizure of the property of Mozambique. EduMoz can obtain the damages it seeks directly from Martins. Defendants fail to identify any reason why the case cannot proceed in the absence of the government defendants.[101] See *Bennett*, 927 F.Supp.2d at 845–46. Consequently, the court concludes that there is no meaningful "potential for injury to the interests of the absent sovereign" in this case, and declines to dismiss the action based on the comity interests identified in *Pimentel*.[102] Cf. *Jota*, 157 F.3d at 162 (reversing a district court's dismissal of Ecuadoran residents' suit against an American oil company on the basis that the participation of the Republic of Ecuador, the current owner and operator of oil drilling equipment, was necessary to afford plaintiffs the full scope of equitable relief they sought, because plaintiffs' claims against the American oil company could proceed even if equitable claims involving the Republic of Ecuador had been dismissed).

### 4. Whether the Court Will Dismiss the Complaint for Failure to Join Silberberg Innovations

Defendants argue that the complaint should be dismissed in its entirety because EduMoz has not joined Silberberg Innovations LLC, which they contend is an indispensable party. "Rule 19 of the Federal Rules of Civil Procedure governs compulsory joinder in federal district courts." *Walter v. Drayson*, 496 F.Supp.2d 1162, 1172 (D.Haw.2007) (citing *EEOC v. Peabody W. Coal Co.*, 400 F.3d 774, 778 (9th Cir.2005), cert. denied, 546 U.S. 1150, 126 S.Ct. 1164, 163 L.Ed.2d 1128 (2006)). Rule 19(a) states, in relevant part:

"A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." FED.R. CIV.PROC. 19(a)(1).

If it is not feasible to join a party found to be "necessary" under Rule 19(a), the court must consider whether "in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Stated differently, the court

---

**101.** Defendants have neither asserted, nor demonstrated, that in the government defendants' absence, "the court cannot accord complete relief among existing parties," or that "disposing of the action in [their] absence may (i) ... impair or impede [their] ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of

incurring double, multiple, or otherwise inconsistent obligations." See FED. R.CIV.P. 19(a); *Bennett*, 927 F.Supp.2d at 845.

**102.** Defendants cite no other authority supporting their argument that the court should dismiss the action in its entirety based on "international comity principles."

must determine whether the necessary party is also "indispensable." FED.R.CIV. PROC. 19(b); see also, e.g., *Estate of Burkhart v. United States,* No. C 07–5467 PJH, 2008 WL 4067429, *6 (N.D.Cal. Aug. 26, 2008) ("If a party is 'necessary' and cannot be joined, 'the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed,' " quoting FED.R.CIV.PROC. 19(b)).

In making this determination, the court must consider:

"(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." *Id.*

Rule 19 thus requires "three successive inquiries": (1) whether a nonparty is "necessary" and should be joined under Rule 19(a); (2) if so, whether it is feasible to order the absent party joined; and (3) if joinder is not feasible, whether the case can proceed without the party, or whether instead the party is "indispensable" such that the action must be dismissed. See, e.g., *Walter,* 496 F.Supp.2d at 1173; see also, e.g., *Disabled Rights Action Committee v. Las Vegas Events, Inc.,* 375 F.3d 861, 867 n. 5 (9th Cir.2004) ("The terms 'necessary' and 'indispensable' are terms of art in Rule 19 jurisprudence: 'Necessary' refers to a party who should be '[j]oined if [f]easible.' ... 'Indispensable' refers to a party whose participation is so important to the resolution of the case that, if the joinder of the party is not feasible, the suit

must be dismissed" (citations omitted)). The Ninth Circuit has cautioned that the Rule 19 inquiry "is a practical, fact specific one, designed to avoid the harsh results of rigid application." *Dawavendewa v. Salt River Project Agricultural Improvement and Power District,* 276 F.3d 1150, 1154 (9th Cir.2002).

■■■ A party may move to dismiss a case for failure to join a necessary and indispensable party under Rule 19. FED. R.CIV.PROC. 12(b)(7); see also, e.g., *Contractors Bonding and Insurance Company v. American Lighting Industry, Inc.,* No. CV 08–813–VAP (JWJx), 2008 WL 4447680, *2 (C.D.Cal. Oct. 1, 2008); *Brosnahan v. Pozgay,* No. CV 06–2195 DMS (NLS), 2007 WL 173969, *2 (S.D.Cal. Jan. 17, 2007). When seeking dismissal for nonjoinder of a necessary and indispensable party under Rules 12(b)(7) and 19, the moving party bears the burden of adducing evidence supporting the motion. *Contractors Bonding and Insurance Company,* 2008 WL 4447680 at *2 (citing *Citizen Band Potawatomi Indian Tribe of Oklahoma v. Collier,* 17 F.3d 1292, 1293 (10th Cir.1994)).

Defendants argue that EduMoz lacks standing to assert the claims set forth in the complaint because it is not a party to the contract—only Silberberg Innovations and Martins are. Although they invoke Rules 12(b)(7) and 19 in asserting that the action should be dismissed, the nature of their challenge is more properly considered a challenge to subject matter jurisdiction under Rule 12(b)(1). See, e.g., *Minden Pictures, Inc. v. John Wiley & Sons, Inc.,* No. C–12–4601 EMC, 2013 WL 1995208, *6 (N.D.Cal. May 13, 2013) (" Rule 12(b)(1) is the appropriate vehicle for dismissing a claim where the plaintiff lacks standing to sue," citing *Warren v. Fox Family Worldwide, Inc.,* 328 F.3d 1136, 1140 (9th Cir.2003)). The court

therefore considers defendants' arguments concerning EduMoz's standing under the legal standard that governs Rule 12(b)(1) motions to dismiss.

▇▇▇ EduMoz does not dispute that it is not a party to the contract. Nor does it allege that defendants defrauded it or directly injured it in any way. It asserts, instead, that it is the successor-in-interest to Silberberg Innovations.[103] Defendants, however, adduce evidence that Silberberg Innovations is an active LLC,[104] and EduMoz does not dispute this fact.

In its opposition, EduMoz argues that it has standing to assert its claims because Silberberg Innovations has assigned the claims to it. It proffers no evidence that this is so, however, and does not allege this fact in the complaint.[105] Additionally, it has adduced no document memorializing Silberberg Innovations' purported assignment of claims to it. Compare *Mercury Cable & Energy, Inc. v. Wang Chen*, No. SACV 12–01857 JGB, 2013 WL 1389990, *6 (C.D.Cal. Apr. 1, 2013) ("Defendants argue that Plaintiff does not have standing to enforce the Winterhalter Agreement because Plaintiff was not a party to the Agreement. The Winterhalter Agreement was executed between Winterhalter and Energy Technology International. On June 1, 2009, ETI assigned all of its rights and obligations under the Winterhalter Agreement to Plaintiff. This Assignment Agreement establishes that Plaintiff has standing to bring claims under the Winter-

halter Agreement"). Finally, it has not proffered Silberberg's declaration stating that such an assignment was effected. Compare *Results ByIQ LLC v. NetCapital.com LLC*, No. C 11–0550–SC, 2013 WL 2436333, *2 (N.D.Cal. May 7, 2013) ("Defendants argue that Results ByIQ lacks standing because it is not the real party in interest to this suit.... Results ByIQ responds that it has standing as successor-in-interest to ByIQ and assignee of ByIQ's claims and causes of action. Mr. Charlton has filed a declaration with the Court asserting that Results ByIQ is ByIQ's successor-in-interest, but Results ByIQ has yet to produce the legal document memorializing this arrangement. The Court cannot dismiss Mr. Fanning's declaration without making a credibility determination, which would be inappropriate at this sta[g]e of the litigation.... Accordingly, the Court declines to grant summary judgment on standing grounds").

Because defendants have mounted a factual attack on the court's subject matter jurisdiction, EduMoz had the burden of furnishing evidence demonstrating that it has standing. *Savage*, 343 F.3d at 1039 n. 2; see also *Board of Trustees of Laborers Health and Welfare Trust Fund for Northern Cal. v. Doctors Medical Center of Modesto*, No. C–07–1740 EMC, 2007 WL 2385097, *5 (N.D.Cal. Aug. 17, 2007) ("The party asserting federal jurisdiction must show express evidence of an explicit assignment in order for a court to find that the alleged assignee has standing," citing

---

103. Complaint, ¶ 2.

104. Basombrio Decl., Docket No. 32–2 (May 2, 2013), Exh. 9. The complaint alleges that Silberberg Innovations, though currently actively, will "imminently be wound up." (Complaint, ¶ 2.)

105. Compare *MVP Asset Management (USA) LLC v. Vestbirk*, No. 2:10–cv–02483–GEB–CKD, 2012 WL 2873371, *4 (E.D.Cal. July 12,

2012) ("at this stage of the pleading, Plaintiff need only show that the facts alleged, if proved, would confer standing upon it"). Although EduMoz alleges that it is Silberberg Innovations' successor-in-interest, "a successor-in-interest is not the same as an assignee." *NFC Collections LLC v. Deutsche Bank Aktiengesellschaft*, No. CV 12–10718 DDP, 2013 WL 1818214, *7 (C.D.Cal. Apr. 29, 2013).

*Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan,* 388 F.3d 393, 401 (3d Cir.2004) (concluding that there had been no assignment where "there is nothing in the record indicating that [participants] did, in fact, assign any claims to the hospital"); *Rogers v. CIGNA Healthcare of Tex., Inc.,* 227 F.Supp.2d 652, 656 (W.D.Tex.2001) (stating that, "for Plaintiffs to have standing to file a derivative action under ... ERISA, they would have to provide valid proof of assignment"); *NYU Hosp. Ctr.–Tisch v. Local 348 Health and Welfare Fund,* No. 04 Civ. 6937, 2005 WL 53261, *3, 2005 U.S. Dist. LEXIS 256, *8 (S.D.N.Y. Jan. 6, 2005) (finding no assignment where defendant "has made no showing of assignment")). EduMoz has adduced no such evidence. By failing to adduce evidence or even allege facts demonstrating that it received an assignment of claims from Silberberg Innovations, EduMoz has failed to meet its burden under Rule 12(b)(1). The court concludes, therefore, that it lacks subject matter jurisdiction to hear all of EduMoz's claims.[106]

### III. CONCLUSION

For the reasons stated, the court lacks subject matter jurisdiction over this action. Accordingly, the court grants defendants' motion to dismiss. Because the government defendants are entitled to sovereign immunity, the court dismisses Edumoz's claims against them with prejudice. With respect to Edumoz's claims against the Foundation defendants, the complaint is dismissed with leave to amend to include allegations establishing EduMoz's standing

to assert Silberberg Innovation's claims. See *Doe v. United States,* 58 F.3d 494, 497 (9th Cir.1995) (" '[A] district court should grant leave to amend ... unless it determines that the pleading could not possibly be cured by the allegation of other facts,' " quoting *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.,* 911 F.2d 242, 247 (9th Cir.1990)). EduMoz may file an amended complaint addressing the standing deficiency identified herein within twenty (20) days of the date of this order.

---

106. Because, for the various reasons stated, the court finds that it lacks subject matter jurisdiction over this action, it does not reach the parties' arguments regarding Edumoz's purported failure to state a claim for relief under Rule 12(b)(6). Nor does the court address whether the action should be dismissed

on *forum non conveniens* grounds. If Edumoz is able to amend its complaint to demonstrate that it has standing, defendants may raise their Rule 12(b)(6) and *forum non conveniens* arguments in a motion to dismiss the amended complaint to the extent the arguments remain applicable.